2019 PA Super 328

| | | |
|---|---|---|
| ALLIED ENVIRONMENTAL SERVICE, INC. T/A ALLIED WELL DRILLING | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 1986 MDA 2018 |
| KURT ROTH, WILLIAM DEINEINGER, | : | |
| JOEL YINGLING, EICHELBERGERS | : | |
| ENERGY CO., LLC T/A | : | |
| EICHELBERGERS WELL DRILLING | : | |

Appeal from the Order Entered November 16, 2018
In the Court of Common Pleas of Berks County Civil Division at No(s):
18-03947

BEFORE:   BOWES, J., McLAUGHLIN, J., and STRASSBURGER*, J.

OPINION BY BOWES, J.:                                    **FILED OCTOBER 29, 2019**

Appellant Allied Environmental Service, Inc. t/a Allied Well Drilling ("Allied") appeals from the November 16, 2018 order denying its request for a preliminary injunction.  After careful review, we affirm.

This case concerns the interplay between restrictive covenants contained in employment agreements executed between Allied and Appellees Kurt Roth and Joel Yingling and the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa.C.S. §§ 5301-5308.[1]  Both Roth and Yingling are now

---

[1] Beyond listing Appellee William Deineinger in the opening paragraph of its brief, Appellant has not submitted any argument concerning Deineinger's employment with Allied.  The trial court reached similar conclusions regarding the dearth of argument regarding Deineinger.  **See** Trial Court Opinion, 1/24/19, at 3 ("Deineinger did not sign an employment agreement, was not a

---

*   Retired Senior Judge assigned to the Superior Court.

employed by Appellee Eichelbergers Energy Co., LLC t/a Eichelbergers Well Drilling ("Eichelbergers"),[2] which is one of Allied's recognized corporate competitors in the drilling business.

The factual and procedural history of this case is relatively complex and concerns the employment timelines of both Roth and Yingling.  Roth originally worked for Eichelbergers from November 2007 until June 2015.  He then started working at Allied as its director of environmental services in June 2015.  On June 2, 2016, Roth executed an employment agreement between himself and Allied ("Roth Agreement"),[3] which included multiple clauses prohibiting Roth from disclosing various categories of "confidential information or knowledge" or from soliciting or accepting business from Allied's clients.  **See**

_____

witness at the preliminary injunction hearing, and is not mentioned in Plaintiff's concise statement of errors complained of on appeal; Deineinger thus plays no major role in the Court's consideration of the petition for preliminary injunction.").  We will accordingly limit our discussion to those issues addressed in Appellant's brief. **See Commonwealth v. Heggins**, 809 A.2d 908, 912 n.2 (Pa.Super. 2002) ("[A]n issue identified on appeal but not developed in the appellant's brief is abandoned and, therefore, waived.").

[2]  Where appropriate, we will refer to Roth, Yingling, and Eichelbergers collectively as "Appellees."

[3] Allied claims that Roth signed the Roth Agreement in preparation for his eventual promotion as Allied's general manager, which post he assumed in December 2016.  **See** N.T. Hearing, 11/14/18, at 32-34.  By contrast, Roth testified that he was asked to sign the Roth Agreement solely in connection with a Maryland drilling license examination for which Allied sponsored him.  **Id.** at 141-43.  Specifically, Roth testified that he first discussed becoming Allied's general manager in December 2016, following the resignation of Allied's former general manager, *i.e.*, approximately six months after the execution of the Roth Agreement.  **Id.** at 143.

Roth Agreement, 6/2/16, at ¶¶ 6.1-6.3. The Roth Agreement also purported to provide Allied with the right "to enjoin [Roth] in a court of equity from violating such provisions, . . . ." *Id.* at ¶ 6.2. The parties agree that in his role as general manager of Allied, Roth was provided with access to a password-protected database containing "customer fee schedules" memorializing the prices that Allied charged or bid for various jobs, as well as the identities of Allied's clients. *Id.* at 45-48, 128-32. Ultimately, Roth left Allied in March 2018 and returned to working for the Eichelbergers.

Yingling began working for Allied in Pennsylvania in November 2010. *Id.* at 186. Yingling worked for Allied as a driller and signed his employment agreement ("Yingling Agreement") on or about January 18, 2017, the day before he was slated to sit for a Maryland drilling license exam for which Allied was his sponsor. *Id.* at 16-18, 20, 186-88. In relevant part, the Yingling Agreement contained a clause providing that Yingling "shall not in any way, directly or indirectly, solicit, divert, take away or attempt to solicit, divert or take away any staff" from Allied. *See* Yingling Agreement at ¶ 6.1. Following his execution of the agreement, Yingling completed his exam successfully and was accredited as a general journeyman driller in Maryland. *Id.* at 182-83. While he was still working for Allied, Yingling suggested that his fellow employee, Shawn Rose, submit an application to Eichelbergers.[4] *Id.* at 179-

_____

[4] Eichelbergers provides a $500 incentive for referrals of successful job applicants by its current employees. *See* N.T. Hearing, 11/14/18, at 206.

80. Thereafter, Yingling departed Allied in January 2018 and began working for Eichelbergers. *Id.* at 174.

On March 20, 2018, Allied sent a letter to Yingling advising him that it considered his employment at Eichelbergers to be a violation of his employment agreement. On April 3, 2018, Allied sent a nearly identical letter to Roth. On April 19, 2018, Allied filed a Complaint alleging various claims for relief under Pennsylvania law in relation to both the Roth and Yingling Agreements, including breach of contract and misappropriation of trade secrets under PUTSA. *See* Complaint, 4/19/18, at ¶¶ 81-90, 107-11. In relevant part, Allied's Complaint requested the entry of preliminary injunctions against Roth, Yingling, and Eichelbergers. *Id.* at ¶¶ 90, 111. On the same day, Allied filed a petition and a supporting memorandum of law requesting the entry of a preliminary injunction that would: (1) enjoin Roth and Yingling from maintaining their employment at Eichelbergers; (2) direct the return of "all trade secrets and confidential information taken" allegedly misappropriated from Allied; and (3) prohibit Eichelbergers from using any such trade secrets or confidential information. *See* Petition for Preliminary Injunction, 4/19/18, at unnumbered 1.

On April 24, 2018, the trial court issued a rule to show cause upon Appellees. On May 7, 2018, the trial court filed an order that gave Appellees

Yingling's name was not listed on Rose's job application and he did not receive a bonus in connection with Rose's accepting employment at Eichelbergers. *Id.* at 178, 217.

thirty days to respond to Allied's petition, and also provided for a ninety-day discovery period. Appellees timely filed an answer to Allied's petition along with new matter challenging the basis of Allied's allegations and claims for relief, which Allied answered. A hearing was held on November 14, 2018 on Allied's petition for a preliminary injunction, at which testimony was adduced from Roth, Yingling, Allied CEO Adam Santry, and Eichelbergers CEO Jerry Rice. On November 16, 2018, the trial court denied Allied's petition for a preliminary injunction, concluding that Allied had not sufficiently satisfied the legal prerequisites for the entry of such an extraordinary remedy.

Allied timely filed a notice of appeal to this Court. The trial court directed Allied to file a concise statement of errors pursuant to Pa.R.A.P. 1925(b), Allied complied, and the trial court filed its Rule 1925(a) opinion. Allied originally preserved ten separate issues for our review in its Rule 1925(b) statement; however, it has briefed only two of these alleged errors, namely: (1) whether the trial court committed reversible error in allegedly failing to "apply, discuss, or consider" PUTSA in denying Allied's request for a preliminary injunction; and (2) whether the trial court committed reversible error in denying a preliminary injunction with respect to Yingling's alleged solicitation of Rose. **See** Appellant's brief at 5.

Although these claims are distinct, they both implicate the trial court's refusal to enter a preliminary injunction. Our scope of review in this context is plenary. **See Warehime v. Warehime**, 860 A.2d 41, 46 n.7 (Pa. 2004). Our standard of review is also well-articulated under existing precedent:

On appeal from the grant or denial of a preliminary injunction, we do not inquire into the merits of the controversy, but rather examine the record to determine if there were any apparently reasonable grounds for the action of the court below. ***Summit Towne Centre, Inc. v. Shoe Show of Rock Mount, Inc.***, 828 A.2d 995, 1000 (Pa. 2003). Only if it is plain that no grounds exist to support the decree or if the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the trial. ***Id.*** When a trial court denies a preliminary injunction, appellate review is "highly deferential." ***Warehime***, 860 A.2d at 46. This standard requires an appellate court to examine the record to determine if there were any apparently reasonable grounds for the ruling under review. ***Id.*** An appellate court will find that "apparently reasonable grounds" exist for the denial of injunctive relief if the trial court properly has found that any of the necessary prerequisites is not satisfied. ***Id. See Buffalo Township v. Jones***, 813 A.2d 659, 664 n.4 (Pa. 2002) (distinguishing the standard of appellate review applicable to the grant or denial of a permanent injunction versus the standard applicable to a ruling on a motion for a preliminary injunction).

***Iron Age Corp. v. Dvorak***, 880 A.2d 657, 661-62 (Pa.Super. 2005).

Furthermore, "[t]he proponent of a preliminary injunction faces a heavy burden of persuasion especially where, as here, the trial court has not been persuaded and has denied the injunction request." ***Allegheny County v. Comm.***, 544 A.2d 1305, 1308 (Pa. 1988).

The Supreme Court of Pennsylvania has set forth six essential prerequisites which a party must satisfy prior to the entry of a preliminary injunction as a general matter:

The party must show 1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; 2) that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings; 3) that a preliminary injunction will properly restore the parties to their

status as it existed immediately prior to the alleged wrongful conduct; 4) that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits; 5) that the injunction it seeks is reasonably suited to abate the offending activity; and, 6) that a preliminary injunction will not adversely affect the public interest.

*Warehime*, *supra* at 47-48. The burden of proof with respect to these six elements falls squarely upon the party seeking injunctive relief. *Id.* Finally, "[i]f a petitioner fails to establish any one of the aforementioned prerequisites, a reviewing court need not address the others." *Greenmoor, Inc. v. Burchick Const. Co., Inc.*, 908 A.2d 310, 313-14 (Pa.Super. 2006).

In its first issue, Allied argues that the trial court erred by failing to adequately consider the import of PUTSA in denying its request for a preliminary injunction. In so doing, Allied appears to have misapprehended the relevance of PUTSA in the context of a request for a preliminary injunction. In pertinent part, PUTSA provides that it "displaces conflicting tort, restitutionary and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret."[5] 12 Pa.C.S. § 5308(a). While PUTSA

---

[5] PUTSA also provides that it was not intended to displace "contractual remedies, whether or not based upon misappropriation of a trade secret." 12 Pa.C.S. § 5308(b)(1); *see also* "UNIFORM LAW COMMENT," 12 Pa.C.S. § 5308 ("The enforceability of covenants not to disclose trade secrets and covenants not to compete that are intended to protect trade secrets, for example, is governed by other law."). In apparent recognition of this distinction, Allied's claims for relief under PUTSA do not rely upon the restrictive covenant signed by Roth. *See* Appellant's brief at 23-24. To the extent that Allied continues to rely upon PUTSA for the enforcement of the

may have extinguished Pennsylvania's common law tort for the misappropriation of trade secrets, the case law that sprung from that jurisprudence remains relevant. ***See also Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC***, 13 F.Supp.3d 465, 474 n.5 (E.D. Pa. 2014) ("PUTSA has displaced Pennsylvania's common law tort for misappropriation of trade secrets, but has essentially retained its definition of trade secret. . . . Pre-PUTSA case law thus remains relevant.").[6]

Allied's argument seems to suggest that PUTSA provides an entirely independent vehicle to justify the issuance of a preliminary injunction that avoids existing case law on preliminary injunctions. ***See*** Appellant's brief at 18-25 (arguing that the trial court should have applied PUTSA in isolation in adjudicating requests for preliminary injunctive relief). Under recent jurisprudence, parties still must satisfy these prerequisites in the context of allegations that a trade secret has been misappropriated in order to obtain a preliminary injunction. ***See Dvorak***, ***supra*** at 662; ***see also WMI Group, Inc. v. Fox***, 109 A.3d 740, 748 (Pa.Super. 2015); ***Shepherd v. Pittsburgh***

---

restrictive covenants in the Roth Agreement, such claims are foreclosed under Section 5308(b)(1). As discussed above, Allied has abandoned all claims that seek to enforce the Roth Agreement pursuant to Pennsylvania contract law by declining to discuss those claims in its brief. ***See supra*** at n.1.

[6] The decisions of federal courts lower than the U.S. Supreme Court "are not binding on Pennsylvania courts," but may be cited as "persuasive authority." ***Martin v. Hale Products, Inc.***, 699 A.2d 1283, 1287 (Pa.Super. 1997).

***Glass Works, LLC***, 25 A.3d 1233, 1240-41 (Pa.Super. 2011). Although this precise issue appears to be one of first impression, we have no trouble concluding that the typical prerequisites attendant to the granting of a preliminary injunction must still be satisfied in claims for injunctive relief advanced under PUTSA. ***See*** 12 Pa.C.S. § 5303(a) (providing that "[a]ctual or threatened misappropriation **may** be enjoined" (emphasis added)).[7]

Instantly, the trial court squarely denied Allied's request for a preliminary injunction as a result of its conclusion that Appellant could not demonstrate "immediate and irreparable harm," nor a "likelihood of success on the merits" under the six-part rubric discussed above. ***See*** Trial Court Opinion, 1/24/19, at 6-8; ***see also*** N.T. Hearing, 11/14/18, at 250 ("I do not believe really that any of the elements have [sic] been met in order to justify me imposing an injunction. . . . I don't feel that the evidence submitted is sufficient to issue a preliminary injunction."). As an initial matter, we reject Allied's suggestions that the trial court was not permitted to ground its ruling in unblemished Pennsylvania precedent concerning preliminary injunctions.

_____

[7] Overall, Allied argues that a preliminary injunction should be practically self-executing under PUTSA once the existence of a trade secret is arguably established. ***See*** Appellant's brief at 18 ("The trial court's application of the law was palpably erroneous . . . because it did not apply [PUTSA] to determine whether an injunction should issue against Roth."). Such a position ignores the well-settled precedent in this Commonwealth concerning the extraordinary and coercive nature of preliminary injunctive relief. ***See Anchel v. Shea***, 762 A.2d 346, 351 (Pa.Super. 2000) ("A preliminary injunction is an extraordinary, interim remedy that should not be issued unless the moving party's right to relief is clear and the wrong to be remedied is manifest.").

Turning to the merits of the trial court's conclusions, it is clear that the trial court's denial of a preliminary injunction was rooted in the deficiencies of Allied's offers of proof, as opposed to some misapprehension of law. With respect to the lack of irreparable harm, the trial court offered the following substantive discussion of Allied's claims:

> [I]mmediacy aside, [Allied] failed to convincingly establish irreparable harm, or indeed much harm at all. The Court strongly credited the testimony of Mr. Rice that he had no need of the confidential information or client relationships that [Allied] argued [Roth] took . . . from Allied to Eichelbergers. Mr. Rice has been in the industry for many years, he has previously worked with most or all of the clients in question and already knows the appropriate contacts and other information for those clients, and indeed [Roth] had already worked for Eichelbergers before going to Allied, meaning much of what they knew actually came from Eichelbergers in the first place. In pursuing its solicitation claims, Plaintiff itself established that there is a dearth of qualified drillers, which bolsters the credibility of Mr. Rice's testimony that he hired the people in question for their experience and skills in the industry rather than for any confidential information they might possess. . . . Here, the Court was persuaded that Eichelbergers did not need or use the supposed confidential information, which makes this case more like *Summit Towne Centre*, *Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995 (Pa. 2003), in which the trial court was likewise skeptical of the claim of harm.

Trial Court Opinion, 1/24/19, at 7-8.

Reviewing this portion of the opinion, we discern that the trial court's conclusion that Allied had failed to demonstrate immediate and irreparable harm stemmed from a conclusion that there was not a sufficient threatened or actual disclosure of Allied's trade secrets. To wit, both Rice and Roth testified that: (1) Eichelbergers already enjoyed pre-existing business

- 10 -

relationships with the clients documented in Allied's client lists,[8] *see* N.T. Hearing, 11/14/18, at 140, 152, 210-12; (2) Allied's pricing information was not particularly valuable or relevant to Eichelbergers in the context of future bids for work, *id.* at 150-51, 210-12, 215; and (3) no misappropriation of Allied's trade secrets actually took place, *i.e.*, Roth did not misappropriate any confidential information from Allied and transmit it to Eichelbergers. *Id.* at 136, 150, 211-12, 222-23.

Allied is technically correct in observing that PUTSA permits the institution of injunctive relief without evidence of actual misappropriation. *See* 12 Pa.C.S. § 5303(a) (permitting injunctive relief to be entered with regard to "threatened" disclosures of trade secrets). Nonetheless, there must still be **some** evidence of an immediate and irreparable harm to justify the entry of a preliminary injunction. As the trial court has aptly observed, that evidence is absent from Allied's offers of proof and argument. Critically, Allied has failed to demonstrate **how** the disclosure of the client lists contained on its confidential database has caused (or could cause) irreparable damage to Allied's relevant business interests in the specific context of this case.[9] **See**

---

[8] Indeed, Roth previously worked at Eichelbergers from 2007 to 2015 before accepting a job offer from Allied. *See* N.T. Hearing, 11/14/18, at 144. In that role, the testimony at the hearing indicates that Roth also enjoyed prior relationships with many of Allied's clients. *Id.* at 140, 152, 211.

[9] Indeed, the very concept of what constitutes a trade secret is "somewhat nebulous." *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214,

N.T. Hearing, 11/14/18, at 43-47 (speculating how a competitor might use Allied's client lists without concrete examples grounded in relevant data, figures, or examples). In this regard, we concur with the trial court's reliance upon our Supreme Court's holding in **Summit Towne Centre**. That case concerned a commercial lease, and the Supreme Court ultimately overruled the entry of a preliminary injunction where the petitioning landlord failed to adequately support its claim that allowing the tenant to cease occupancy would somehow lead to a "domino theory" of tenant loss. **See Summit Towne Centre**, **supra** at 1002-03 (finding sufficient grounds to deny preliminary injunction where there was "no concrete evidence of harm" where arguments "rested almost entirely on speculation and hypothesis").[10]

_____

1228 (Pa.Super. 1989). "Therefore, the decision of whether a particular compilation of customer data deserves protection as a trade secret necessarily must be made on a case-by-case basis." **Dvorak**, **supra** at 664. Finally, information must be an "actual secret" of "peculiar importance to the employer's business" to qualify for protection as a trade secret. **Id**. Mere "general trade practices" are not deserving of protection. **Id**.

[10] As in **Summit Town Centre**, the trial court also concluded that Allied had failed to present competent evidence demonstrating that monetary damages would not provide an adequate or complete remedy. **Compare** Trial Court Opinion, 1/24/19, at 8 **with Summit Town Centre**, 828 A.2d at 1003 ("[I]t was reasonable for the court to conclude that any harm actually sustained . . . could be remedied by monetary damages either by way of the liquidated damages clause in the . . . agreement, . . . or through a suit for damages sounding in breach of contract."). Instantly, Allied's complaint contains claims related to alleged breaches of contract. **See** Allied's complaint, 4/19/18, at ¶¶ 107-11. The Roth Agreement also contains a liquidated damages clause. **See** Roth Agreement at ¶ 7.

Furthermore, we are cognizant of the dim view that Pennsylvania precedent takes concerning extending trade secret protections to mere client lists. In *Dvorak*, this Court explicitly discussed in great detail whether customer-related data like the kind implicated by this case is deserving of protection as a trade secret under Pennsylvania law:

> [O]ur Supreme Court has held that, under certain circumstances, customers lists and customer data may be entitled to protection as trade secrets. *Morgan's Home Equipment Corp. v. Martucci*, 136 A.2d 838, 842 (Pa. 1957). Furthermore, a trade secret may include compiled information which gives one business an opportunity to obtain an advantage over competitors. *Wellspan Health v. Bayliss*, 869 A.2d 990, 997 (Pa.Super. 2005). Nevertheless, customer lists "are at the very periphery of the law of unfair competition." *Renee Beauty Salons, Inc. v. Blose-Venable*, 652 A.2d 1345, 1347 (Pa.Super. 1995). There is no legal incentive to protect the compilation of such lists "because they are developed in the normal course of business anyway." *Fidelity Fund, Inc. v. DiSanto*, 500 A.2d 431, 436 (Pa.Super. 1985).

*Dvorak*, *supra* at 663. Thus, while a list of customer data may be considered a trade secret for the purposes of injunctive relief, such information is not automatically entitled to such protection as Allied claims. *See* 12 Pa.C.S. § 5302 (stating that a "customer list" **may** constitute a trade secret if it also satisfies the statutory definition). In particular, the Pennsylvania Supreme Court has opined that such protections are appropriate in businesses that lead to the establishment of "permanent and exclusive relationships" between "customers and salesmen." In that context, such customer lists "represent a material investment of employers' time and money" and "is highly confidential

and constitutes a valuable asset" such that it is deserving of protection as a trade secret. **Martucci**, **supra** at 842.

Instantly, the testimony adduced at the injunction hearing demonstrates that Allied's relationship with its clients is neither permanent nor exclusive. **See** N.T. Hearing, 11/14/18, at 140, 152, 210-12 (describing Eichelbergers' independent business relationships with Allied's clients). The present situation is also analogous to **Dvorak** in that this same testimony establishes that "many industry customers are shared by multiple suppliers and, therefore, customer lists are widely known." **Dvorak**, **supra** at 664. Finally, Rice also testified that the identities of potential customers and the amounts of public bids for drilling work were readily ascertainable without substantial effort or expense on the part of Eichelbergers. **See** N.T. Hearing, 11/14/18, at 211-12; **see also Dvorak**, **supra** at 664. Under Pennsylvania law, "if a competitor could obtain the information by legitimate means, it will not be given injunctive protection as a trade secret." **Bayliss**, **supra** at 997.

Based on the foregoing discussion, we conclude that the record contains reasonable grounds to support the trial court's conclusion that Allied has failed to adequately show that a preliminary injunction with respect to Roth and Eichelbergers is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. The trial court reasonably concludes that Allied's evidence concerning damages is too speculative and remote to justify the entry of a preliminary injunction, and we discern no

palpable error of law in its analysis. *See Summit Towne Centre*, *supra* at 1002-03; *Dvorak*, *supra* at 663-64; *Bayliss*, *supra* at 997.

Allied's second issue pertains to Yingling's solicitation of Rose to submit an application to Eichelbergers, and Allied's request for injunctive relief under the terms of the Yingling Agreement. *See* Appellant's brief at 25-27 ("The trial court was also palpably erroneous in refusing to issue an injunction prohibiting Yingling from soliciting current Allied employees."). In particular, Allied argues that the "[l]oss of valuable employees with specialized skills who are difficult to replace will invariably lead to a loss of market advantage and business opportunities." *Id.* at 26. To be clear, Yingling's encouragement of Rose to submit a job application to Eichelbergers is the **only evidence** offered by Allied to substantiate Yingling's alleged breach of the Yingling Agreement. *See* N.T. Hearing, 11/14/18, at 177-81.

As an initial matter, this issue is moot. The uncontroverted testimony adduced at the hearing reveals that Rose was only employed at Eichelbergers for approximately four months, and has since returned to work at Allied. *Id.* at 177, 199-200. Assuming, *arguendo*, that Yingling's initial "solicitation" of Rose qualified as a breach of the Yingling Agreement, the complained-of damages cited by Allied, *i.e.*, the loss of Rose as an employee, are no longer relevant or operative in this case. Moreover, Allied has advanced no substantive argument that Rose's temporary absence from Allied resulted in any relevant detriment (quantifiable or not). Its line of argument is highly

speculative and relies upon the consideration of hypothetical events not present in the record. Similar to its treatment of the first issue, Allied has failed to show that the temporary loss of Rose as an employee has led to the loss of any "market advantage" or "business opportunities" for Allied. **See Summit Towne Centre**, **supra** at 1002-03. Allied has also failed to demonstrate why the entry of a preliminary injunction is necessary to prevent future harm with specific reference to non-solicitation under the Yingling Agreement. **See Continental Group, Inc. v. Amoco Chemicals Corp.**, 614 F.2d 351, 359 (3d Cir. 1980) ("[A]n injunction may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, . . . .").[11] Consequently, this claim is similarly without merit.

Overall, the record supports the trial court's conclusion that Allied has failed to show that a preliminary injunction is necessary to prevent immediate and irreparable harm. Our independent review of the record discloses that reasonable grounds exist for the holding of the trial court and there is no indication that the trial court misapplied Pennsylvania law. Therefore, we will affirm the trial court's denial of a preliminary injunction.

Order affirmed.

_____

[11] **See supra** at n.6.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/29/2019</u>